IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | 4:03-cv-90406 |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| JOHN HANSL, | * | MEMORANDUM OPINION |
| | * | AND ORDER |
| Defendant. | * | |

Before the Court are cross motions for summary judgment. The Government filed its motion for summary judgment on January 31, 2005 (Clerk's No. 82). Defendant John Hansl filed his motion for summary judgment on the same date (Clerk's No. 85). Each party filed a resistance to the other's motion. Likewise, both parties have filed reply briefs. A hearing was held on the motions on March 23, 2005. The matter is fully submitted.

## I.  BACKGROUND

On July 24, 2003, the Government filed this action seeking to revoke the United States citizenship and certificate of naturalization of Defendant John Hansl pursuant to section 340(a) of the Immigration and Nationality Act of 1952, as amended ("INA"). 8 U.S.C. § 1451(a). The Government claims that Defendant illegally procured United States citizenship, in that he was legally ineligible to receive a visa to enter the United States under the Refugee Relief Act of 1953, Pub. L. No. 203, 67 Stat. 400, as amended, 68 Stat. 1044 (1944) ("RRA").

The following facts, pleaded in the Government's Statement of Material Facts, are undisputed. The Plaintiff in this matter is the United States of America. Defendant is a natural person. This Court

properly has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331, 1335, and section 340(a) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1451(a).  Venue is proper in the Southern District of Iowa pursuant to section 340(a), which provides that an action to revoke citizenship shall be brought in the judicial district in which the naturalized citizen resides at the time the suit is brought.  At the time the present action was filed, Defendant was a resident of Des Moines, Iowa.

Defendant was born on January 21, 1925, in Donji Miholjac, Yugoslavia, which is located in present day Croatia.  On February 22, 1943, at the age of eighteen, the Defendant, known at the time by the name "Johann Hansl" entered the Nazi Waffen SS (Armed SS), receiving the rank of SS Schütze (private).  Defendant was assigned to the 1st Company of the SS Death's Head Guard Battalion (*Totenkopf-Wachbataillon*) at Sachsenhausen Concentration Camp (also known as "Oranienburg Concentration Camp") near Berlin, Germany, where he received an SS blood type tattoo.

Sachsenhausen Concentration Camp was a place of persecution.  Thousands of persons were imprisoned and murdered at the camp because of, amongst other things, their race, religion, or national origin.  Sachsenhausen contained work facilities, where prisoners were forced to perform various types of labor.  The complex housed a crematorium, a gas chamber, a shooting pit used for executions by firing squad, and a gallows.  Starvation and disease were rampant among the prisoner population at Sachsenhausen, due to inadequate food and unsanitary conditions.  Thousands of prisoners, who wore only light-weight striped uniforms year round, died, while others, deemed too ill or too weak to work, were killed or transferred to other camps to be killed.  Many Sachsenhausen prisoners were murdered by shooting, hanging, gassing, beatings, and other means.  The camp was also the site of a variety of

-2-

gruesome medical experiments that resulted in the deaths of many prisoners.  In all, tens of thousands of

men, women and children died in the Sachsenhausen system while it was in operation.

All Nazi concentration camps, including Sachsenhausen, were guarded by SS Death's Head

guards.  These guards could request transfer to other duty.  Defendant served as an armed guard of

prisoners at Sachsenhausen Concentration Camp until on or about October 29, 1943.  His duties

included guarding prisoners from a watch tower, escorting prisoners on marches to and from sites near

the main camp where the prisoners performed forced labor, and guarding prisoners while they

performed forced labor outside the camp.   These duties were performed on a rotating basis and were

the standard duties that perimeter guards, such as the Defendant, were ordered to perform.  On at least

one occasion, the Defendant assisted in the search for a missing prisoner.  When the prisoner was

found, he was shot to death, though the parties agree that Defendant did not personally shoot the

prisoner.

While on duty, Defendant's purpose was to prevent prisoners from escaping.  While performing

watch tower duties, Defendant was armed with a machine gun.  While escorting prisoners to forced

labor sites and guarding them as they worked, Defendant was armed with a rifle.  He marched along-

side the prisoners and gave them orders.  Defendant was under strict orders to shoot any prisoners who

attempted to escape.  As a member of the SS Death's Head Guard Battalion at Sachsenhausen,

Defendant wore a uniform, was paid, and was allowed to leave the camp to travel to nearby Berlin

when not on duty.

On or about October 29, 1943, approximately 150 Death's Head guards, including the

Defendant, were transferred out of Sachsenhausen Concentration Camp.  Records reflect that from

November 1943 to March 1944, the Defendant served with an SS unit in or near Lublin, Poland.  In

March 1944, Defendant was transferred to the SS Death's Head Guard Battalion at Natzweiler

Concentration Camp, near the town of Natzweiler, in Nazi-occupied France.  Like Sachsenhausen,

Natzweiler was a place of persecution where thousands of persons were imprisoned and murdered

because of their race, religion, or national origin.  Natzweiler housed a gas chamber, a crematorium,

and was the site of a variety of gruesome medical experiments.  The conditions at Natzweiler were like

those at Sachsenhausen, with starvation and disease rampant among the prisoner population.  Many

Natzweiler prisoners were murdered by shooting, hanging, gassing, beatings, or other means.

Defendant's duties at Natzweiler were nearly identical to his duties at Sachsenhausen.  Until

October 1944, Defendant served as an armed guard of prisoners.  Armed with a machine gun, he

guarded prisoners from a watch tower.  Armed with a rifle, he escorted prisoners to forced labor sites

and guarded them while they worked.  Defendant's purpose as an SS Death's Head guard at

Natzweiler was to prevent prisoners from escaping.  Indeed, while guarding forced labor details, the

Defendant told prisoners that if they attempted to escape, he would shoot them.  On at least one

occasion, Defendant guarded prisoners on a train transport from Natzweiler to another concentration

camp.  Like at Sachsenhausen, the Defendant was under strict orders to shoot any prisoner who

attempted to escape.  While stationed at Natzweiler, the Defendant was allowed to leave the camp and

travel to a nearby village when not on duty.

In September 1944, Defendant was transferred to a combat unit, the 17th SS Reconnaissance

Battalion, a component of the 17th SS Armored Infantry Division "Götz von Berlichingen."  On

approximately November 30, 1944, the Defendant was wounded in combat near Sarreguemines in

eastern France.  He remained in various German military hospitals until January 1945, when he was

transferred to a healing station in Augsburg, Germany.  In May 1945, Defendant was captured by the

United States Third Army in Augsburg and was held as a prisoner-of-war.  In February 1947, he was

transferred to the custody of French authorities.  He was eventually released from custody in

November 1947.

In August 1955, Defendant applied for an immigration visa under the RRA at the United States

Consulate in Salzburg, Austria.  On his visa application, Defendant's name, date of birth, and place of

birth were correctly listed.  His wartime residence was listed from 1943 to 1945 as the "German

Army."[1]  On August 29, 1955, United States State Department Vice Consul Richard Bloomfield issued

Defendant a visa.  The visa was also approved by Lester Greener, an Immigration and Naturalization

Service Inspector stationed in Salzburg.  Defendant entered the United States at the Port of New York,

as a non-quota immigrant under the RRA, on November 9, 1955.  He was naturalized by the United

States District Court for the Southern District of Iowa on October 30, 1961, and received Certificate

of Naturalization No. 8366435.

## II.   STANDARD FOR SUMMARY JUDGMENT

Summary judgment has a special place in civil litigation.  The device "has proven its usefulness

as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce

judicial resources in more beneficial ways."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st

Cir. 1991).  In operation, the role of summary judgment is to pierce the boilerplate of the pleadings and

---

[1]  Defendant notes that he did not personally list his wartime residence as the "German Army."
Rather, it was typed for him, as was standard practice at consular posts.

assay the parties' proof in order to determine whether trial is actually required.  *See id.*; *see also*

*Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990).

"[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the

movant has established his right to a judgment with such clarity as to leave no room for controversy and

that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson*

*Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v.*

*Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n.5 (8th Cir. 1975)).  The purpose of the rule is not "'to cut

litigants off from their right of trial by jury if they really have issues to try,'" *Poller v. Columbia Broad.*

*Sys., Inc.*, 368 U.S. 464, 467 (1962) (quoting *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S.

620, 627 (1944)), but to avoid "useless, expensive and time-consuming trials where there is actually no

genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div.*, *Houdaille Indus., Inc.*,

545 F.2d 1127, 1129 (8th Cir. 1976) (citing *Lyons v. Board of Educ.*, 523 F.2d 340, 347 (8th Cir.

1975)).

The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986).  The precise standard for granting summary judgment is well-established and oft-repeated:

summary judgment is properly granted when the record, viewed in the light most favorable to the

nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no

genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  *See* Fed.

R. Civ. P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994). The court does not weigh the evidence nor make credibility determinations, rather the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 252 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir. 1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact."). It is the unusual case where the party shouldering the burden of proof prevails on a summary judgment motion. *See Turner v. Ferguson*, 149 F.3d 821, 824 (8th Cir. 1998) ("Summary judgments in favor of parties who have the burden of proof are rare, and rightly so.").

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex*, 477 U.S. at 323; *Anderson*, 477 U.S. at 248. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. *See* Fed. R. Civ. P. 5(c), (e); *Celotex Corp.*, 477 U.S. at 322-23; *Anderson*, 477 U.S. at 257. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248. "As to materiality, the substantive law will identify which facts are material . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

-7-

### III.  LAW AND ANALYSIS

While denaturalization is undoubtedly a civil proceeding, the Government "'carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship.'" *See  Federenko v. United States*, 449 U.S. 490, 505 (1981) (quoting *Costello v. United States*, 365 U.S. 265, 269 (1961)).  Thus, "[t]he evidence justifying revocation of citizenship must be 'clear, unequivocal, and convincing' and not leave 'the issue in doubt.'  Any less exacting standard would be inconsistent with the importance of the right that is at stake in a denaturalization proceeding."  *Federenko*, 449 U.S. at 505 (quoting *Schneiderman v. United States*, 320 U.S. 118, 125 (1943) (some internal quotations and citations omitted)).  The Supreme Court has recognized that the burden of proof in denaturalization proceedings is largely identical to the proof beyond a reasonable doubt standard required in criminal proceedings.  *See Klapprott v. United States*, 335 U.S. 601, 612 (1949) ("Furthermore, because of the grave consequences incident to denaturalization proceedings we have held that a burden rests on the Government to prove its charges in such cases by clear, unequivocal and convincing evidence which does not leave the issue in doubt. This burden is substantially identical with that required in criminal cases–proof beyond a reasonable doubt.").

While the Government must meet a high threshold to prevail on summary judgment, the task is not insurmountable.  For while it must present clear, unequivocal, and convincing evidence, the fact remains that a certificate of citizenship is not immune from challenge.  This is because the certificate is "an instrument granting political privileges, and open like other public grants to be revoked if and when it shall be found to have been unlawfully or fraudulently procured."  *Johannessen v. United States*, 225 U.S. 227, 238 (1912).  As the Court in *Fedorenko* observed:

> [O]ur cases have also recognized that there must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship. Failure to comply with any of these conditions renders the certificate of citizenship "illegally procured," and naturalization that is unlawfully procured can be set aside. As we explained in one of these prior decisions: "An alien who seeks political rights as a member of this Nation can rightfully obtain them only upon terms and conditions specified by Congress . . . . No alien has the slightest right to naturalization unless all statutory requirements are complied with; and every certificate of citizenship must be treated as granted upon condition that the government may challenge it . . . and demand its cancellation unless issued in accordance with such requirements."  This judicial insistence on strict compliance with the statutory conditions precedent to naturalization is simply an acknowledgment of the fact that Congress alone has the constitutional authority to prescribe rules for naturalization, and the courts' task is to assure compliance with the particular prerequisites to the acquisition of United States citizenship by naturalization legislated to safeguard the integrity of this "priceless treasure."

*Federenko*, 449 U.S. at 506 (citations omitted).

Title 8 U.S.C. § 1451(a) provides that United States Attorneys have a duty to institute proceedings for denaturalization when the "order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation . . . ."  In the sole count of the Complaint, the Government asserts that Defendant illegally procured his United States citizenship in that he was unlawfully admitted to the United States under the RRA.  Section 14(a) of the RRA provides: "No visa shall be issued under this Act to any person who personally advocated or assisted in the persecution of any person or group of persons because of race, religion, or national origin."  The Government argues that Defendant was legally ineligible to receive a visa to enter the United States because of his personal conduct while serving in the Death's Head Guard Battalion.

One of the requirements for naturalization is "lawful admission" for permanent residence.  8 U.S.C. § 1427.  If the Government is correct in its assertion that Defendant's admission to the United States was unlawful within the meaning of the RRA, then Defendant's visa was invalid and he was, in

turn, not admitted lawfully to the United States for permanent residence.  *See* 8 U.S.C. § 1181(a)(1)

("[N]o immigrant shall be admitted into the United States unless at the time of application for admission

he . . . has a *valid* unexpired immigrant visa." ) (emphasis added); *see also United States v. Negele*,

222 F.3d 443, 447 (8th Cir. 2000) (holding defendant was ineligible to receive an immigration visa

under the Displaced Persons Act and, therefore, failed to gain lawful admission to the country because

he entered the country with an invalid visa).  "Because an individual may not be naturalized unless he

has first been lawfully admitted for permanent residence," citizenship founded on an invalid visa amounts

to illegal procurement.  *Negele*, 222 F.3d at 447 (citing 8 U.S.C. §§ 1427(a)(1), 1451(a)).

At the time hearing was held on the present matter, there existed only one case dealing directly

with denaturalization founded upon entry under the RRA.  *See United States v. Friedrich*, 305 F.

Supp. 2d 1101 (E.D. Mo. 2004).  The facts of *Friedrich* are identical in many ways to those now

before the Court.  Friedrich, an ethnic German born in Romania, joined the Waffen SS in October

1942.  *Id*. at 1103.  After completing basic training, Friedrich was assigned to the Death's Head unit at

the Gross-Rosen concentration camp, and later was assigned to the Dyhenfurth concentration camp.

*Id*.  Friedrich's duties as a Death's Head guard, like Defendant, were to guard the perimeter of the

camp, escort work-details to forced labor sites and guard the prisoners while they worked, and to

escort prisoners from one concentration camp to another.  *Id*.  Friedrich was under orders to shoot any

prisoners who attempted to escape.  *Id*.  After Allied troops overtook the German forces, Friedrich

lived in Austria for several years, and eventually applied for a visa to the United States.  *Id*.  His visa

application stated that he was in the German Army from 1942 to 1945, but made no mention of his

Waffen SS service or of his duties as a concentration camp guard.  *Id*.  Friedrich was granted a visa

under the RRA, entered the United States, and was eventually naturalized on May 4, 1962.  *Id*.

As in the present case, the dominant issue in *Friedrich* was whether Friedrich's service in the Death's Head unit rendered him ineligible for the visa he received under the RRA.  *Id*.  Friedrich argued that ineligibility for admission under the RRA turned on whether an individual "personally" engaged in acts of persecution.  *Id*.  Defendant here, like Friedrich, argues that he did not "personally" advocate or assist in the persecution of the prisoners at the concentration camps because there is no evidence that he subjectively intended to persecute others, nor is there any evidence that "any particular behavior on the part of John Hansl rose to the level of 'personally advocating or assisting in persecution.'" Def.'s Br. In Support of Mot. For Summ. J. at 14.

In *Friedrich*, Chief Judge Carol E. Jackson rejected the arguments raised and found that the plain and ordinary language of the RRA offered no support for the proposition that "by adding the word 'personally' to the RRA, Congress intended to require a showing of [an individual's] subjective intent to persecute or that he engaged in acts causing specific harm to individuals." *Friedrich*, 305 F. Supp. 2d at 1107.  Chief Judge Jackson concluded:  "Friedrich's service, even in the absence of any evidence that he personally committed atrocities against these individuals, qualifies as 'advocat[ing] or assist[ing] in persecution.'" *Id*. (citing *United States v. Szehinskyj*, 277 F.3d 331, 339 (3d Cir. 2002)). Moreover, the court rejected the argument that deference must be given to the eligibility decision of the vice consul who issued the visa in the first instance.  *Id*.  "'The plain meaning of a statute controls, if there is one, regardless of an agency's interpretation.'" *Id*. (quoting *Hennepin County Med. Ctr. v. Shalala*, 81 F.3d 743, 748 (8th Cir. 1996)).

In the present case, Defendant offers extensive argument that the Court should reject the

reasoning of *Friedrich* because, while Friedrich entered the United States under the RRA, Defendant

claims the *Friedrich* Court based its decision on cases involving the INA and the Displaced Persons

Act of 1948, 62 Stat. 1009 (1948) (the "DPA").  Likewise, Defendant argues that case law from

courts across the country granting summary judgment on denaturalization involving concentration camp

guards should be rejected because those cases hinged either on the DPA, which preceded the RRA or

on the Holtzman Amendment, 8 U.S.C. § 1182(a)(3)(E), which came after the RRA.  *See e.g.*,

*Negele*, 222 F.3d at 447-78 (service in Waffen SS Death's Head guard unit, at Sachsenhausen

concentration camp and Theresienstadt internment camp, was membership and participation in

movement hostile to United States within meaning of DPA); *Tittjung v. Reno*, 199 F.3d 393, 398 (7th

Cir. 1999) (concluding service as an armed SS Death's Head Battalion concentration camp guard

constituted assisting in persecution within the meaning of the Holtzman Amendment); *Hammer v. INS*,

195 F.3d 836, 843 (6th Cir. 1999) (upholding a removal order against a former SS Death's Head

Battalion guard under the Holtzman Amendment); *Kalejs v. INS*, 10 F.3d 441, 444 (7th Cir. 1993)

("The Holtzman Amendment's non-criminal provision thus makes assistance in persecution an

independent basis for deportation, and assistance may be inferred from the general nature of the

person's role in the war"); *Kairys v. INS*, 981 F.2d 937, 943 (7th Cir. 1992) (stating that as effective

aiders and abettors of the Nazi conspiracy, armed concentration camp guards are subject to

deportation under the Holtzman Amendment);  *United States v. Schmidt*, 923 F.2d 1253, 1257 (7th

Cir. 1991) (affirming order of denaturalization in case of armed guard in concentration camp and finding

that such service was sufficient to establish that the guard "assisted in persecution" within the meaning of

the DPA); *United States v. Wasylyk*, 162 F. Supp. 2d 86, 93-94 (N.D.N.Y. 2001) (holding that

armed guard of concentration camp assisted the enemy in the persecution of civilians and was,

therefore, ineligible for a visa under the DPA, regardless of whether he personally injured or killed

anyone); *United States v. Hutyrczyk*, 803 F. Supp. 1001, 1009-10 (D.N.J 1992) (summary

judgment proper because concentration camp guard assisted in the persecution of the camp's Jewish

inmates within the meaning of the DPA); *United States v. Leprich*, 666 F. Supp. 967, 968-69 (E.D.

Mich. 1987) (holding immigrant was ineligible for visa he received under DPA because he had been a

concentration camp guard and because he misrepresented his wartime service by failing to disclose his

guard duty in his visa application, requiring revocation of his naturalization).

Shortly following this Court's hearing on the parties' motions for summary judgment, the Eighth

Circuit Court of Appeals affirmed Chief Judge Jackson's ruling in *Friedrich*. *See United States v.*

*Friedrich*, No. 04-1728, 2005 WL 729464 (8th Cir. Mar. 31, 2005).  The Eighth Circuit rejected

Friedrich's contention that "in light of the need to impart some meaning to the word 'personally,'" the

RRA should be interpreted to require that an applicant must have had a subjective mental intent to

engage in persecution.  *Id*. at *2 ("We agree with the district court that nothing in the ordinary meaning

of the word 'personally' suggests that it connotes 'having a subjective mental intent about it.'").

Moreover, the Court accepted as true Friedrich's contention that he "never saw a prisoner escape,

never harmed a prisoner, never discharged his weapon while guarding prisoners, and never saw any

prisoners die during the forced evacuation marches." *Id*. at *3.  Nonetheless, based on Friedrich's

admitted service as a Death's Head guard at Nazi concentration camps, the fact that he was armed

during his duties, and the fact that he had strict orders to shoot prisoners attempting to escape, the

Court held:

> By guarding the perimeters of the Gross-Rosen, Dyhenfurth, and Flossenburg concentration camps to ensure that prisoners did not escape from these unspeakable conditions, Friedrich personally assisted in the persecution that occurred in those camps, within the meaning of the RRA. Because Friedrich's actions rendered him ineligible for a visa under the RRA, the issuance of his visa in 1955 was void *ab initio*. Accordingly, he was not lawfully admitted for permanent residence, and his subsequent naturalization was illegally procured.

*Id*. Moreover, in addressing the argument that deference should be accorded the decision to grant Friedrich a visa, the Court found that no deference should be granted in light of the Court's conclusion that "Congress intended the RRA to prohibit the State Department from granting a visa to an armed Death's Head concentration camp guard." *Id*. at *4, n.5.

In a letter from Defendant's counsel, dated April 6, 2005, Defendant attempts to distinguish the facts and the ruling in the *Friedrich* case from the present one. First, Defendant argues that the *Friedrich* district court was not presented with any evidence of legislative history regarding the development and passage of the RRA. "Therefore, when the 8th Circuit stated in a footnote that '[w]e have concluded that Congress intended the RRA to prohibit the State Department from granting a visa to an armed Death's Head concentration camp guard,' it was because that Court, unlike this Court, had to rely on only the legislative history of the Holtzman Amendment passed in 1978, which has absolutely nothing to do with the RRA's original legislative history or intent." Def.'s Letter at 1.

In briefing the present motion for summary judgment, Defendant cites extensively to the legislative history of the RRA. Defendant suggests that, to determine the meaning of the word "personally" in the RRA, the Court must review the committee hearings and look to hearing debates to discern what Congress actually intended to convey by the use of the word. Unfortunately, Defendant's

reliance solely on legislative history is contrary to the well-established rules of statutory construction, *i.e.*, that courts must assume, "absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'" *Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 388  (1993) (citation omitted); *see also United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241 (1989) (stating that when the statute's language is plain the sole function of the court is to enforce it according to its terms).

"The 'strong presumption' that the plain language of the statute expresses congressional intent is rebutted only in 'rare and exceptional circumstances,' when a contrary legislative intent is clearly expressed." *Ardestani v. I.N.S.*, 502 U.S. 129, 135 (1991) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)); *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1032 (8th Cir. 2003) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."). Thus, where a statute is clear, courts should look to the legislative history only if Congress expressed a legislative intention contrary to the plain language of the statute. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). In this case, the plain language of the RRA provides, "No visa shall be issued . . . to *any person who personally advocated or assisted in the persecution* of any person or group of persons because of race, religion, or national origin." RRA Section 14(a) (emphasis added). As noted by Chief Judge Jackson:  "'Personal,' as defined by Black's Law Dictionary, (5th ed. 1979), means 'Appertaining to the person; belonging to an individual . . . .'" *Friedrich*, 305 F. Supp. 2d at 1106. Webster's Dictionary defines the term as:  "so as to be personal; in a personal manner; often; as oneself; on or for one's own part." Webster's Third New International

Dictionary (1961).   "An 'ambiguity exists when a statute is capable of being understood by reasonably well-informed persons in two or more different senses.'"   *In re Erickson P'ship*, 856 F.2d 1068, 1070 (8th Cir. 1988) (quoting *Allen v. Geneva Steel Co.*, 281 F.3d 1173, 1178 (10th Cir. 2002) (additional citations omitted)).  Here, the Court finds there is nothing in the language of the RRA, or in the meaning of the word "personally," that is ambiguous.   There is no ambiguity in the statute itself, no inconsistency between the language of section 14(a) and other language in the statute, and a plain language reading does not create an irrational result.  *See id.*   "Unless exceptional circumstances dictate otherwise, when we find the terms of a statute unambiguous, judicial inquiry is complete."  *Neosho*, 315 F.3d at 1032-33 ("Absent some ambiguity in the statute, [the court has] no occasion to look to legislative history.") (citing *Burlington N. R.R. v. Okla. Tax Comm'n*, 481 U.S. 454, 461 (1987)).

The legislative history Defendant presents does not "clearly express" an intention to restrict or alter the ordinary meaning of the term "personally."[2]  Even if the legislative history *clearly* conflicted with the ordinary meaning of the term "personally," however, "'[t]he mere fact that statutory provisions conflict with language in the legislative history is not an exceptional circumstance permitting a court to apply the legislative history rather than the statute.'"  *Neosho*, 315 F.3d at 1033 (quoting *Erickson*, 856 F.2d at 1070).  Further, the Eighth Circuit has clearly stated that the Court must "refuse to read

---

[2]  Defendant contends, for example, that the Court should adopt the meaning of the word personally proposed by Mr. James Finucane, who initially proposed the word in hearing on H.R. 7376. Defendant argues, "Mr. Finucane's intended purpose in proposing the legislative language of 'personally' included advocating an 'amnesty for immigration purposes' for those who had not 'actually committed the crimes of intolerance,' while excluding those who had 'actually' done so."  Def.'s Br. in Resistance to Summ. J. at 23.  H.R. 7376 was never passed into law, and the opinion of one witness in a congressional hearing cannot forever bind or dictate what the intent of the entire Congress was when the RRA actually was passed into law.

into the statute what Congress has declined to include." *Id.* (quoting *Welsh v. Boy Scouts of Am.*, 993 F.2d 1267, 1270 (7th Cir. 1993)).  Here, Congress declined to include a definition of the term personally and the legislative history does not clearly express an intent to adopt some alternative meaning for the word.  Accordingly, the plain and ordinary meaning of that term must govern, that is, a person could not receive a visa under the RRA if that person "on or for [his] own part" advocated or assisted in persecution.

Defendant next argues that the present case is distinguishable from *Friedrich* because Friedrich voluntarily joined the Waffen SS, while Defendant was essentially involuntarily conscripted.  Whether or not the Defendant's service in the Waffen SS was voluntary, however, is irrelevant to a determination of whether his visa was properly issued within the meaning of the RRA.  The plain language of RRA section 14(a) does not contain a voluntariness requirement.  In *Federenko*, the Supreme Court, addressing the assistance in persecution provision of the DPA, found:  "Under traditional principles of statutory construction, the deliberate omission of the word 'voluntary' from [the DPA] compels the conclusion that the statute made *all those* who assisted in the persecution of civilians ineligible for visas," not just those whose assistance in persecution was voluntary.  *Fedorenko*, 449 U.S. at 512 ("The plain language of the [DPA] mandates precisely the literal interpretation . . . an individual's service as a concentration camp armed guard–whether voluntary or involuntary–[makes such person] ineligible for a visa.").  The *Federenko* Court also noted that when Congress seeks to impose voluntariness exceptions into the law, it must do so expressly:

> That Congress was perfectly capable of adopting a "voluntariness" limitation where it felt that one was necessary is plain from comparing [the provisions of the DPA, one of]

> which excludes only those individuals who "*voluntarily* assisted the enemy forces . . .
> in their operations . . . ." Under traditional principles of statutory construction, the
> deliberate omission of the word "voluntary" from [the DPA provision under
> consideration] compels the conclusion that the statute made *all* those who assisted in
> the persecution of civilians ineligible for visas.

*Federenko*, 449 U.S. at 512. The mere fact that the present action arises under the RRA, rather than

under the DPA, cannot alter the conclusion that if Congress had wanted to impose a voluntariness

requirement in the RRA, it clearly could have done so. Congress did not, however, impose such a

requirement. This Court is "not at liberty to imply a condition which is opposed to the explicit terms of

the statute. . . . To [so] hold . . . is not to construe the [RRA] but to amend it." *Id.* (citing *Detroit

Trust Co. v. The Thomas Barlum*, 293 U.S. 21, 38 (1934)).

Defendant next argues that there exists strong circumstantial evidence showing that Defendant's

service was well known to immigration officials at the time his visa was granted. Defendant asserts that

this distinguishes his case from Friedrich's case because Friedrich actively attempted to conceal his

affiliation with German forces while the Defendant did not. Even assuming, however, that immigration

and consular official were fully aware of Defendant's status as a member of the Waffen SS, and of his

duties as a Death's Head guard, the fact remains that if Defendant "personally advocated or assisted in

the persecution of any person or group of persons because of race, religion, or national origin," he had

no legal right to a visa, regardless of what the issuing officials knew or did not know. This is so because

the mistaken grant of a visa confers no rights upon its recipient. *See e.g.*, *Aguirre-Moreno v. INS*, 89

F.3d 844, 1996 WL 344614, at *1 (9th Cir. 1996) ("A visa is not valid, however, if issued on the

basis of mistake. . . . If the consular officer issued Aguirre-Moreno's visa by mistake, the visa, though

issued properly procedurally, is still invalid. "); *Lai Haw Wong v. INS*, 474 F.2d 739, 742 (9th Cir. 1973) (mistaken admission cannot constitute lawful admission). Moreover, the face of Defendant's visa indicates that it "does *not* entitle the bearer to enter the United States if, upon arrival at a port of entry of the United States, he is found to be inadmissible under the law." Pl.'s App. Exh. 27 (emphasis in original). Defendant identifies no law that would legitimately lead the court to conclude that the Government must be bound by the mistakes of its agents in a matter so important as immigration, even when the error is not discovered until thirty years after its commission. On the contrary, the law provides that Government agents cannot act outside the scope of their authority, as such authority is defined by Congress. "Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. . . . And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority." *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947); *see also Walls v. Mississippi State Dep't of Pub. Welfare*, 730 F.32d 306, 324 (5th Cir. 1984) (finding the Government is not bound by mistakes of its agents when seeking to vindicate a public right). The Fifth Circuit has eloquently stated why Defendant's argument must fail: "It would be paradoxical if a person who was ineligible to receive a visa and should have been excluded from admission became lawfully admitted simply because, by error, he was not excluded." *In re Longstaff*, 716 F.2d 1439, 1441-42 (5th Cir. 1983).[3]

---

[3] This same reasoning applies to Defendant's argument that he should not be denaturalized because numerous other concentration camp guards were admitted to the United States under circumstances where it was clear that the vice consuls knew of their service. The mere fact that other persons may have been unlawfully admitted to the United States does not diminish Defendant's own

Defendant make numerous other arguments, and cites sundry purportedly disputed issues of material fact in his pleadings which the Court finds no reason to address in detail.[4]  Such issues are superfluous to the narrow question raised by the Government's Complaint, that is, whether Defendant personally advocated or assisted in the persecution of any person or group of persons because of their race, religion, or national origin.  The wealth of case law on the issue under both the Holtzman Amendment and the DPA, as well as the Eighth Circuit Court of Appeals ruling in *Friedrich*, decided under the RRA, compel this Court to conclude that he did.  *See e.g.*, *Federenko*, 449 U.S. at 512 n.34 ("[T]here can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders . . . assisted in the persecution of civilians."); *Negele*, 368 F.3d at 984 ("We conclude that by impeding prisoners' escape through his presence as an armed SS Death's Head Battalion Guard, Negele was actively and personally involved in persecution.  By guarding the perimeters of the camps with a trained guard dog to ensure prisoners did not escape from life-threatening conditions, Negele contributed to the persecution which occurred in these facilities.  There is little doubt the prisoners within the facilities Negele patrolled with his dog . . . would have considered him as part of the Nazi machine which kept

---

unlawful admission or make it any less actionable.

[4]  Amongst other things, Defendant argues: 1) a heightened standards of review should be applied because the Government's pleadings allege that he was "complicit in [a] closed culture of murder;" 2) the Office of Special Investigations is limited to tracking "Nazi war criminals;" 3) the Government must make a showing of substantial federal benefit to be gained by deporting the Defendant; and 4) the Government's failure "to produce relevant and important evidence . . . must raise the presumption that . . . the evidence would be unfavorable to the government."

them at death's gate."); *Schmidt*, 923 F.2d at 1259 ("Service as an armed guard . . . ensured the

systematic destruction of concentration camp inmates. . . .  Thus, even if Schmidt personally did not

participate in the brutal acts committed at Sachsenhausen, the fact of his armed, uniformed service is

sufficient to establish that he assisted in persecution."); *United States v. Kairys*, 782 F.2d 1374, 1378

(7th Cir. 1986) ("*Fedorenko* continues to stand for the proposition that service as an armed guard

equals persecution."); *Schellong v. INS*, 805 F.2d 655, 661 (7th Cir. 1986) ("Nazi concentration

camps were places of persecution; individuals who, armed with guns, held the prisoners captive and

prodded them into forced labor with threats of death or capital punishment cannot deny that they aided

the Nazis in their program of racial, political, and religious oppression."); *Wasylyk*, 162 F. Supp.2d at

93 ("Even accepting defendant's statement that neither he nor anyone else killed any Jews while he was

there, it is obvious that the presence of armed, uniformed guards served to oppress the inmates as well

as to deter any attempts to escape, resist or obtain help.  Defendant's portrayal of himself as a slave

laborer no different from the Jews does not mitigate the fact that as an armed, uniformed guard at a

watchtower at the gate of a forced labor camp, he assisted in the Nazis' imprisonment and forced labor

of Jewish inmates of the camp."); *United States v. Schiffer*, 831 F. Supp. 1166, 1198 (E.D. Pa.

1993) ("The evidence clearly and unequivocally established that defendant, as an armed Waffen-SS

guard at Sachsenhausen, Trawniki, Majdanek and Hersbruck concentration camps, was an active

participant in the persecution occurring at these camps in that he helped prevent inmates from escaping

the grotesquely inhumane conditions there."); *Hutyrczyk*, 803 F. Supp. at 1010 ("Without individuals

guarding the perimeter of the camp at night, ensuring that no Jew escaped, the cruel treatment would

not have been able to continue. Defendant's work, then, does seem to have been assisting

persecution."); *United States v. Osidach*, 513 F. Supp. 51, 90 (E.D. Pa. 1981) ("The mere presence of the watchful eye of the conqueror or his deputies, coupled with the often demonstrated presence of both the means and the inclination to persistently inflict various indignities . . . is the personification of mental persecution to anyone, let alone innocent civilian [s] . . . reduced to various degrees of substandard mental and physical well-being.").

After a careful review of the record in this matter, Defendant's admitted conduct while a Death's Head guard at Sachsenhausen and Natzweiler is ample to find that he "personally advocated or assisted in the persecution" of persons because of their race, religion, or national origin.  Defendant freely admits that both Sachsenhausen and Natzweiler were places of persecution founded upon race, religion, and national origin.  Defendant also freely admits that, as a Death's Head guard at Nazi concentration camps, his duty was to prevent prisoners from escaping.  He accomplished this by carrying either a machine gun or rifle and standing watch over the camp or over work-details outside the camp.  Defendant admits personally walking only a few feet away from prisoners with a rifle, giving the prisoners orders, and telling them on at least one occasion that he would shoot them should they try to escape.  Finally, Defendant admits to assisting in the search for an escaped prisoner, who ended up being shot.  All of Defendant's activities and duties as a Death's Head Guard contributed and enabled the atmosphere of hate, suffering, and persecution faced by the concentration camp victims.  Defendant personally undertook these actions and thus, personally assisted in persecution within the meaning of the RRA.

Chief Judge Richard S. Arnold succinctly and correctly recognized  in *Turner*, that "[s]ummary

judgments in favor of parties who have the burden of proof are rare, and rightly so." *Turner*, 149 F.3d at 824. Nonetheless, even before the adoption of the Federal Rules of Civil Procedure, the Supreme Court recognized that summary judgment merely "'prescribe[d] the means of making an issue.'" Arthur R. Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Cliches Eroding Our Day in Court and Jury Trial Commitments?*, 78 N.Y.U.L.R. 982, 1019 (June 2003) (quoting *Fidelity & Deposit Co. v. United States*, 187 U.S. 315, 320 (1902) (noting that only when the issue is made as prescribed does the right of trial by jury accrue)). The Court fully recognizes its duty to ensure that *any* doubt as to the facts of the present case must be resolved by denying summary judgment. This is particularly true where, as here, a grant of summary judgment necessarily results in the loss of a precious and irreplaceable interest–an individual's American citizenship. Despite the gravity of the consequences, however, the Court cannot ignore the Supreme Court's mandate to ensure "strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship." *Federenko*, 449 U.S. at 506. In this case, Defendant's admissions regarding his personal conduct as a Death's Head guard leave no room for factual dispute as to whether he personally advocated or assisted in persecution. As a matter of law, then, he was ineligible to receive a visa under the RRA. As such, Defendant was never lawfully admitted to the United States and his citizenship and certificate of naturalization were illegally procured under 8 U.S.C. § 1451(a).

## III.  CONCLUSION

For the reasons stated herein, the Defendant's Motion for Summary Judgment is DENIED. The Government's Motion for Summary Judgment is GRANTED. The Court Order dated October

30, 1961, admitting Defendant John Hansl to United States citizenship is hereby revoked.  Certificate of

Naturalization No. 8366435 is hereby canceled.  Upon receipt of this Order, Defendant shall surrender

Certificate of Naturalization No. 8366435 and his United States passport, if he has one, to the Attorney

General.

IT IS SO ORDERED

Dated this ___8th___ day of April, 2005.

_____
ROBERT W. PRATT
U.S. DISTRICT JUDGE